Good morning, Your Honors. May it please the Court, I'm Sarah Marriott from Ora Carrington Sutcliffe, representing the petitioners Stephen Jeffery and Pit John Tan. Petitioners are a married couple from Indonesia who filed for asylum based on persecution they suffered as Chinese Christians in Indonesia. That application was denied as untimely. However, in holding that the application was untimely, the BIA made a key error of law that requires reversal by this Court. That error was the misapplication of the Doctrine of Changed Circumstances, and that doctrine here excused petitioners' failure to file within one year of Mr. Jeffery's last entry into the United States. Specifically, the changed circumstances were persecution that was suffered by Ms. Tan during her last visit to Indonesia in 2000, and her application was filed. Now, you've just used a buzzword, persecution suffered by Ms. Tan, her last, her 2000 visit. As I understand it, there were some random phone calls that I have trouble identifying with the government or, and so I wonder how you would explain, even if it's timely, where is the persecution? Well, I think that the question you're asking really gets to the eligibility for asylum based on this Court's analysis of the disfavored group. This Court has in a number of cases, including Sell v. Ashcroft and also recently in, I think it's Hakari v. I'm not sure, but it can't be the group in the air. I mean, it has to be some action somehow linked to a government official that is on a protected ground. So let's say the protected ground is that she was a Christian. Yes. A Chinese Christian.  Well, the link to the government in this case is the applicant can be eligible for asylum based on violence, persecution that is, that the government is unwilling or unable to control. And there's been a lot of evidence submitted by petitioners that the violence against Christians and also against ethnic Chinese in Indonesia has been something the government has perhaps been both unwilling and unable to control. There was evidence. Even under the disfavored group theory, there has to be some link to these individuals suffering because they are part of the group. It still has to be individualized. And just speaking only for myself, I'm concerned that from your side of the case, what happened to your clients was, although not a good thing, did not rise to the level of what our cases have called persecution. And even though they're members of a disfavored group, that still wouldn't get them all the way there. Well, assuming for the moment that it doesn't rise to the level of past persecution, that's not required in the context of the disfavored group analysis. This Court has said that when an applicant is a member of a disfavored group, there is a comparatively low level of individualized risk that the applicant needs to demonstrate. And I believe that the incidents that were suffered by petitioners here do meet that standard. For example, well, specifically the threats that Ms. Tan received, numerous threats of, while anonymous, threats of death and rape, are very severe. And anonymous threats have, by this Court, been found to be sufficient. For example, in Canales-Vargas v. Gonzalez, the anonymous threats were found sufficient. And if you look at other examples of what happened to petitioners, they testified, I believe they testified before the IJ, and it was also in their application for asylum, that their car had been surrounded by mobs on the way to church. They also testified that on occasion their church itself had been surrounded while their worshipers were inside. This is pretty similar to the instances that were described in the Sahel case. In that case, the applicant had been in a taxi that was surrounded by a mob, had suffered vandalism, had been shouted at. That had also happened to petitioners. They had had people say, go back to China, other types of verbal harassment. It's all very similar to what in Sahel, in conjunction with a showing that these applicants were a member of a church, should they return to Indonesia. Putting aside for the moment the eligibility for asylum, the IJ denied the petition for asylum based on untimeliness and the finding that there were no changed country conditions, that it would be a changed circumstance. The BIA affirmed the denial of asylum, citing its decision in Burbano, adopting the reasoning of the IJ, but it did specifically limit the denial of asylum to the untimeliness realm. So should this court determine that the IJ misapplied the law as to change circumstance, a reversal and remand to the BIA would be appropriate here. I had one other question about the record. It's my recollection that your clients returned periodically to Indonesia, and we have at least one case that holds that that is a factor to be considered in determining the reasonableness of someone's fear to return to their native country. How do you – first of all, am I correct about the record? And secondly, what role should that fact play? You are correct about the record. Petitioners did return to Indonesia on a number of occasions, but that factor certainly isn't dispositive here. And I think if you – the facts will show why. Mr. Jeffrey, his last return to Indonesia was in 1998, and the record shows a great deal of violence against ethnic Chinese in Indonesia in 1998, and he testified that he was afraid to return after that time. So he, in fact, didn't return once there had been this spike in violence. Ms. Tan said that her mother was still in Indonesia, and in 2000 she basically braved her fears and returned to Indonesia to visit her mother, and at that point the – what she was suffering became much more severe. She testified that it was really these threats of the death and rape that motivated her filing the application for asylum. And at that point she – she returned to the United States and, in fact, also brought her mother back with her, which one of the other factors to consider is whether the other family members remained in Indonesia, and the record shows that the parents of Mr. Jeffrey and Ms. Tan, once she suffered this increase in persecution, that her mother came back with her as well. So that would support a finding that there was a well-founded fear there. And one other point on the untimeliness issue is that although the application was a little confusing, but – and it appears to be a derivative and beneficiary application, it really was a joint application filed by both of the parties. Both Ms. – Mr. Jeffrey and Ms. Tan had independent asylum claims. And, in fact, you know, Ms. Tan had even more individualized factors of supporting her asylum claim. And so with the two independent asylum claims under this Court's decision in Ma versus Ashcroft, really she should be – upon finding that her testimony is credible, which the IJ did not make an adverse credibility finding and did indicate that the testimony was credible, that she should automatically be deemed a refugee. She's really not – she's not a derivative beneficiary. And that the timeliness of the filing as to Ms. Tan was before the IJ. He did recognize and elicited testimony on the fact that the application was filed within one year. In fact, I think less than three months after her last entry into the United States, and that more than meets the one-year filing deadline in these cases. Ms. Murray, you may want to save a little time for rebuttal. I will save my last 30 seconds. Okay. Ms. Clay? Good morning, Judge. Good morning, counsel. Are we taking questions, or should I just go ahead and open up the meeting? Please just proceed. Okay. Petitioners, as you have pointed out, have made repeated trips back to Indonesia, despite their assertion that they fear persecution in Indonesia, and whose only mistreatment amounted to a few intercepted anonymous phone calls during his wife's brief visit with her mother in 2000. They fail to compare reversal with the immigration judge's determination that they do not qualify for asylum withholding or removal or protection because the hominid subject did not rise to the level of persecution. Counsel, I have a question for you about the timeliness issue, which was the primary, but not the only, basis of the decision. Should we examine timeliness separately with respect to each of the petitioners, and if not, why not? We would submit that it wouldn't be necessary. Even assuming argument, though, that the immigration judge erred in finding the application untimely, the immigration judge did analyze the case as if it was filed timely. In other words, in the alternatives, IJ found that the petitioners did not meet their burden of proof for asylum on the merits. So it sounds like you're urging us to reach the merits as well. That's correct. So both sides would like us to assume that. Okay. Contrary to Petitioner's assertion regarding the severity of the harm, this Court has held in Lolong, and I submit that this case is very similar to Lolong, that there has been found no persecution against ethnic Chinese Christians in Indonesia based on the volumes of evidence that has been presented to this Court. Well, we've said that the threshold is very low. And certainly there is testimony that shows some level of threat. Why isn't that passed at a low threshold? The Ms. Tan has suggested that the anonymous calls that she received meets the low, the comparatively low burden of proof. However, by comparison, to sale, it does not. The anonymous calls that she receives were not even intended for Ms. Tan. Ms. Tan happened to have been going home on a visit with her mother, and these calls were being received by her mother long before she had even gotten there. There's no evidence of who the petitioner, who the callers are. There's no evidence in the record that shows that they know who Ms. Tan is. There's no evidence that they know that she's a permanent resident of the building. Quite frankly, anyone who received the record could honestly believe that it could have been a prank call to any household, and any woman who answered the telephone would have received such a call. It also begs the question, the mother, these calls were so menacing and so scary. The mother never mentioned these calls to anyone, and I would assume that the mother is kind of up in age. I can't imagine that something that could scare Ms. Tan so much would not, in fact, scare her mother or at least prompt her to seek assistance through maybe police or even had contacted her own daughter about the phone calls. And by comparison, when you look at the comparatively low burden of demonstrating an individualized risk, the individualized risk still has to be the risk of that particular person. The record does not reflect that those anonymous calls were directed at Ms. Tan specifically. By comparison to the petitioner in Sale, Sale actually had experienced her tires being slashed, her car had been etched in all kinds of epithets. She's been shouted at by persons who said she doesn't belong in the neighborhood because she's Chinese. She also went to the police to report the incident, and the police said you don't want to report because you don't want to agitate the perpetrators. So by far, the petitioner in this case does not come anywhere near the comparatively low burden of showing an individualized harm to establish her eligibility for asylum. Okay. Any other questions? I don't think we have any other questions. Thank you. Thank you. Ms. Marriott. A couple quick points. First, the government cites Luolong. This case is readily distinguishable from the Luolong case. In that case, there was sort of no evidence whatsoever of an individualized risk. So our case in which the petitioners did present evidence of threats that they specifically received is quite different from just relying on a disfavored group. And I think I'm about out of time. All right. Thank you. And, Ms. Marriott, I know you had an accepted appointment on the Court's pro bono program, and the Court appreciates your doing so and your firm's allowing you to do so. Thank you. The matter just argued will be submitted. And I will next hear argument in Kilpatrick v. Hernandez. Thank you.
judges: Rymer, Graber, Aldrich